**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HERMAN BARRAZA | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:16-CV-1072 |
| | § | |
| NANCY A. BERRYHILL, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON
MOTIONS FOR SUMMARY JUDGMENT**

On July 14, 2016, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c). (Docket Entry #9). The case was then transferred to this court. (Docket Entry #10). Cross-motions for summary judgment have been filed by Plaintiff Hermann Barraza ("Plaintiff," "Barraza") and Nancy Berryhill ("Defendant," "Commissioner"), in her capacity as Acting Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #13; Defendant's Cross Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #12). Defendant has also filed a reply. (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry #14). After considering the pleadings, the evidence submitted, and the applicable law, the court ORDERS that Defendant's Motion be **GRANTED**, and that Plaintiff's Motion be **DENIED**.

*Background*

On March 19, 2012, Plaintiff Herman Barraza filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and under Part A of Title XVIII of Act. (Transcript ["Tr."] at 144). In his application for benefits, Barraza claimed that he has been unable to work since February 16, 2007, because he has arthritis, nerve damage in his arms, legs, back and neck, high blood pressure, depression, anxiety, and joint pain. (*See* Tr. at 144, 175). On June 14, 2012, the SSA found that Barraza was not disabled under the Act, and so his application was denied. (Tr. at 57-58). Plaintiff petitioned for a reconsideration of that decision, but his claim was again denied on September 4, 2012. (Tr. at 85). He then successfully requested a hearing before an administrative law judge ("ALJ"). (Tr. at 99-100). That hearing took place on September 5, 2013, before ALJ William B. Howard. (Tr. at 27-35). Plaintiff testified at the hearing and was assisted by his attorney, Donald Dewberry. (Tr. at 52-83). Dr. Robert H. Smiley, a medical expert witness, testified at the hearing, as did Kay Squires Gilreath, a vocational rehabilitation consultant. (Tr. at 71-83).

On October 25, 2013, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

5.    If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995).  It is well-settled that, under this analysis, Barraza has the burden to prove any disability that is relevant to the first four steps.  *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Barraza has not engaged in substantial gainful activity since February 16, 2007, when he last worked. (Tr. at 29). The ALJ further concluded that Plaintiff suffers from degenerative disc disease of the cervical and lumbar spine, hypertension, and obesity, and that these impairments are severe. (*Id.*). The ALJ also considered Plaintiff's testimony that he continues to have pain in both hands following surgery for carpal tunnel syndrome. (*Id.*). The ALJ determined this condition to be a non-severe impairment, because there was no objective medical evidence that Plaintiff's hands were limited in any way. (*Id.*). The ALJ further found that Barraza's impairments did not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[1] (*Id.*). He then assessed Plaintiff's residual functional capacity ("RFC"), and concluded that he is capable of performing light work,[2] although he can stand and/or walk for only about four hours in an eight hour workday, and he can sit for only six hours. (Tr. at 32). The ALJ also determined that Barraza should not work at unprotected heights or around dangerous machinery, and he can only occasionally climb

---

[1] A claimant is presumed to be "disabled" if his impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

[2] "Light work" involves lifting no more than twenty pounds, occasionally, with the ability to lift or carry items weighing up to ten pounds frequently. Although the weight lifted may be very little, a job is designated as "light" if it requires a good deal of walking or standing, or if it involves sitting a majority of the time, with some pushing and pulling of arm or leg controls. To be considered capable of performing a full range of light work, an individual must be able to perform substantially all of the activities listed. An individual must also be capable of performing sedentary work, unless there are additional limiting factors, such as the loss of manual dexterity, or the inability to sit for long periods. 20 C.F.R. §§404.1567(a),(b).

one flight of stairs.  (Tr. at 32).  With these limitations, the ALJ decided that Barraza is capable of performing his past relevant work as a security guard.  (Tr. at 34).  For that reason, he concluded that Barraza is "not under a disability, as defined in the Social Security Act," and he denied the application for benefits on October 25, 2013.  (Tr. at 35).

On November 21, 2013, Plaintiff requested an Appeals Council review of the ALJ's decision.  (Tr. at 23).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's actions, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On October 7, 2014, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed.  (Tr. at 1-3).  With this ruling, the ALJ's decision became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On April 15, 2016, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Original Complaint, Docket Entry #1).  The parties have filed cross-motions for summary judgment.  (Docket Entries 12, 13).  Having considered the pleadings, the evidence submitted, and the applicable law, Defendant's motion for summary judgment is **GRANTED**, and Plaintiff's motion for summary judgment is **DENIED**.

### Standard of Review

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

### Discussion

Before this court, Barraza argues that the ALJ erred, because he did not consider Plaintiff's carpal tunnel syndrome when determining his residual functional capacity. (Plaintiff's Motion at 6, 7-11). Plaintiff also contends that the ALJ ignored the testimony from the medical expert witness when he concluded that Barraza was capable of doing light work, rather than only sedentary work. (Plaintiff's Motion at 6, 11-14). Finally, Plaintiff complains that the ALJ incorrectly concluded that he could perform his past work as a security guard even though his physical limitations, as described by the ALJ, prevent him from meeting all of the job

requirements for that position. (Plaintiff's Motion at 6, 14-16). Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Barraza is not disabled. (Defendant's Motion at 4).

### Medical Facts, Opinions, and Diagnoses

The earliest medical records show that Plaintiff was treated at the Veterans Administration Medical Center in October, 2001. (Tr. at 577-580). An x-ray of his right shoulder was normal. (Tr. at 565). X-rays of both knees revealed bone spurring on both kneecaps.[3] He complained of back pain, and x-rays showed that his lumbar spine was normal, but he had degenerative changes in the lower thoracic spine. (Tr. at 561, 564). Barraza was seen at the VA clinic's eye care center on November 1, 2001, as part of a new patient evaluation. (Tr. at 546). He complained of hypertension, as well as arthritis in his right shoulder, hips, and knees. (Tr. at 546-547).

An MRI of the left knee was completed on January 9, 2002, at the request of Dr. John Vanderpool. (Tr. at 558, 560-561). That examination showed that Barraza had tendonitis, which was caused by calcium deposits in the muscles surrounding the knee, but no structural defect or damage to the knee was apparent. (*Id.*). X-rays of the lower back were repeated. (Tr. at 557-558). This time, the x-rays were interpreted to show spondylosis throughout the lumbar spine with small anterior osteophytes.[4]

The following year, in May of 2003, Barraza went to the Bay Area Neurology for an EMG because of pain and tingling in his left arm and hand. (Tr. at 501-505). Dr. Edward Good ("Dr. Good") believed the test showed mild carpal tunnel syndrome in the left hand and wrist.

---

[3] A bone spur is a bony projection that develops along the edge of a bone. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1531 (5th ed. 1998).

[4] Spondylosis is a degenerative change characterized by stiffness or fixation of a vertebral joint. MOSBY'S at 1528. An osteophyte is a bony outgrowth, usually found at a joint. MOSBY'S at 1169.

(Tr. at 500).  Dr. Good did posit that it was possible that the left hand complaints were caused by pressure on the spinal nerve root at the junction of the cervical spine and the thoracic spine.  (Tr. at 500).  One week after the EMG was completed, Barraza returned to Dr. Good's office.  (Tr. at 506).  While at work that day, Barraza developed a sharp, severe pain in his back, which was accompanied by numbness and tingling in his face.  (*Id.*).  He also complained of pain under his left arm when turning his head to the left and raising his arm.  (*Id.*).  Dr. Good's neurological examination of Plaintiff was unremarkable.  Plaintiff's strength, reflexes, and sensations were intact and normal.  (Tr. at 506).  Dr. Good recommended an MRI of the cervical spine, but the results of that test are not included in the administrative record.  (*Id.*).

Plaintiff next went to see Dr. Michael Brown ("Dr. Brown"), at The Hand Center, to have surgery on his left hand and arm.  (Tr. at 509).  He told Dr. Brown that for several months, he had experienced numbness and tingling in the fingers and fingertips of his left hand.  (*Id.*).  Dr. Brown's examination of Barraza revealed symptoms consistent with carpal tunnel syndrome.  (Tr. at 509).  A nerve conduction study confirmed that diagnosis, and also ruled out a nerve injury in the neck as a cause of the numbness in his hands.  (Tr. at 510-511).  Barraza was also diagnosed with tennis elbow in his left arm.  (Tr. at 508).  Dr. Brown operated on Plaintiff's left hand and elbow on July 15, 2003, to correct the tennis elbow and carpal tunnel syndrome.  (Tr. at 496-498).

On June 10, 2004, Barraza told Dr. Benny Sanchez ("Dr. Sanchez"), of Doctor's Hospital – Tidwell, that he had experienced pain in his neck and upper left arm for more than six months.  (Tr. at 367).  Dr. Sanchez diagnosed a pinched nerve in his neck, and, because conservative treatment had not been successful, he recommended a cervical epidural steroid injection.  (Tr. at

62, 367). That procedure did succeed in reducing Plaintiff's pain, and a second injection took place on July 26, 2004. (Tr. at 365).

Dr. Terry Newman ("Dr. Newman") treated Plaintiff on March 8, 2005, for high blood pressure. (Tr. at 328). Dr. Newman's records show that Barraza had been taking medication to control his blood pressure, but he wanted to discontinue the medication. (*Id.*). Because his blood pressure was still borderline high, the doctor decided to continue the medication. (*Id.*). Plaintiff then had surgery for carpal tunnel syndrome on his right hand in March of 2006. (Tr. at 518, 330). Plaintiff testified that this surgery was necessary because he injured his hand while assembling air conditioning units at work. (Tr. at 61). The next record of treatment is dated October 27, 2006, when Plaintiff saw Dr. Benjamin Guillermo ("Dr. Guillermo") at Gulf Coast Medical Group to review and refill his prescriptions for Tricor and Caduet.[5] (Tr. at 285).

On December 18, 2006, Barraza went to the emergency room at Clear Lake Regional Medical Center, complaining of left arm and left leg pain, as well as facial numbness. (Tr. at 255). He was worried because the pain originated in his chest and radiated to his extremities. (*Id.*). Several cardiac tests were completed, but they did not explain his complaints of chest or arm pain. (Tr. at 257-258). An MRI of the cervical spine showed mild degenerative changes in Barraza's neck, but no herniations or narrowing of the spinal canal. (Tr. at 259-260). An x-ray confirmed degenerative changes at the level of C2-3. (Tr. at 264). An MRI of the lumbar spine showed a herniated disc at the L5-S1 level in his lower back. (Tr. at 262-263).

Barraza then saw Dr. Guillermo on December 20, 2006, complaining of headaches, neck pain, left arm pain and pain down his left side. (Tr. at 283). X-rays of the lumbar spine revealed minimal bone spurring in the upper lumbar spine and lower thoracic spine. (Tr. at 312). Cervical spine x-rays showed arthritis in his neck at the C2-C3 level, and mild narrowing of the

---

[5] Tricor is prescribed to treat high cholesterol. Caduet is used to treat high blood pressure.

disc spaces at the C5-C6 level. (Tr. at 313). Dr. Guillermo prescribed Flexeril, a muscle relaxant, and methylprednisolone, a steroid used to treat inflammation from arthritis. (Tr. at 283). He also referred Plaintiff to Dr. Ali Javanshir ("Dr. Javanshir") for a neurological evaluation. (Tr. at 283). Dr. Janvashir, at Omega Neurology, treated him on December 28, 2006. (Tr. at 314). Plaintiff explained to Dr. Janvashir that his neck and back pain had occurred suddenly about two weeks earlier while he was driving. (Tr. at 314). Although he had pain in his neck radiating to his left arm, and pain in his lower back extending into his left leg, he did not have any weakness or difficulty in walking. (Tr. at 314). When Dr. Janvashir examined him, Barraza did not have any spinal pain, was able to walk normally, and had a normal sensation in his fingers and toes. (Tr. at 315-316). Dr. Javanshir considered several possible causes of Plaintiff's pain, including spinal stenosis, entrapped nerves, nerve damage, either at the spine or in the extremities (polyradiculopathy and polyneuropathy), and multiple sclerosis. (Tr. at 316). He recommended an MRI of Plaintiff's brain and spine, and an emg/nerve conduction study of his left arm and leg. There is no evidence these tests were ever completed. (Tr. at 317).

Plaintiff again complained of back pain to Dr. Rajeswari Rajan ("Dr. Rajan"), at Gulf Coast Medical Group, on April 4, 2007, when he sought treatment for a rash. (Tr. at 281). Dr. Rajan reported that Barraza had a reduced range of motion, but a normal heel/toe walk. (Tr. at 281). Dr. Rajan prescribed an antifungal cream for the rash, and refilled Plaintiff's prescriptions for Caduet, Tricor, Flexeril, and Vicodin, a painkiller. (Tr. at 281). Barraza saw Dr. Rajan again for an annual physical on April 18, 2007. (Tr. at 279-280). Dr. Rajan listed obesity, spondylosis, high cholesterol, and high blood pressure, when describing Barraza's health conditions. (Tr. at 279). Dr. Rajan's physical examination showed no abnormalities in Plaintiff's upper or lower extremities, and normal coordination without sensory or motor deficits

during the neurological examination. Dr. Rajan did report that Plaintiff had a reduced range of motion during the examination. (Tr. at 279). Dr. Rajan counseled Plaintiff to diet and to exercise, and to return in one month. (Tr. at 279). Barraza went back to Dr. Rajan on April 30, 2007, complaining of pain in the right side of his abdomen, reporting that the pain had begun a month earlier. (Tr. at 277). Dr. Rajan ordered an ultrasound of the abdomen that showed a slightly enlarged liver, but no other abnormalities. (Tr. at 309). Plaintiff returned to Gulf Coast Medical Group on August 22, 2007, to have his prescriptions refilled. (Tr. at 274). He complained that his medications were not strong enough, and he was prescribed Soma in place of Flexeril, and given Norco, a stronger version of Vicodin. (Tr. at 274). During the examination, Dr. Rajan reported that Plaintiff had a reduced range of motion in his spine. (Tr. at 274). He again instructed Barraza to diet and exercise, and return in one month. (Tr. at 274).

Barraza continued to complain of neck pain when he returned to Dr. Guillermo on November 1, 2007. (Tr. at 271). Although he did not have low back pain at that time, he complained of neck pain radiating to both shoulders and arms. (Tr. at 271). He also complained that the pain was worse on the left side. (*Id.*). Dr. Guillermo found Plaintiff to have a normal range of motion in his shoulders and neck, but he did complain of discomfort when bending his neck. (*Id.*). He walked with a normal gait, had no muscle weakness, tingling or numbness, and no joint stiffness. (Tr. at 271). Dr. Guillermo replaced the Norco prescription with Darvocet and Flexeril, and ordered an MRI and x-rays of his neck. (Tr. at 272). The x-ray showed arthritis at C2-C3 and C5-C6 with some narrowing of the opening where the nerve exits the spine at C5-C6. (Tr. at 308). An MRI showed bone spurring at the C5-C6 level that pressed into the spinal canal and caused narrowing of the opening for the nerves. (Tr. at 300). There was also a small disc bulge at C3-C4. (*Id*) An x-ray of the low back showed bone spurring at several levels, but, did

not show any significant structural problems with the lumbar spine. (Tr. at 297). Dr. Guillermo discussed the results of these studies with Plaintiff on November 19, 2007. (Tr. at 269). At that time, Barraza still complained of neck pain radiating into both arms, but he now also complained of low back pain radiating into his legs. (Tr. at 269). A straight leg test was positive, and Plaintiff complained of tenderness in his lower back.[6] (Tr. at 269). However, he had a normal gait when Dr. Guillermo examined him, and the doctor saw no evidence of spinal tenderness, muscle spasms, or abnormal motor, sensory or reflex responses. (Tr. at 269). Dr. Guillermo prescribed Ultram, and told Plaintiff to see a spine specialist. (Tr. at 269-270).

Dr. Newman saw Plaintiff on February 25, 2008, to treat his hypertension and high cholesterol. (Tr. at 267). Barraza did not describe any significant neck or back complaints at that time, and he had no edema or abnormal pulses in his extremities. (*Id.*). Dr. Newman refilled Plaintiff's blood pressure medication. The next medical record available is from August 19, 2008, when Plaintiff returned to the VA clinic. (Tr. at 536). At that time, he complained of pain in his neck and shoulders, lower back, and left knee. (Tr. at 539). Plaintiff told Dr. Ronald Marek ("Dr. Marek") that he had received a series of three injections in his neck and back between November 2007, and January 2008, because of pain radiating into his arms and legs.[7] (Tr. at 536). He also told Dr. Marek that the injections relieved his pain for only a month, at most, and that the only medications he was taking were Caduet for hypertension, and ibuprofen. (Tr. at 536). During the examination, Plaintiff had a full range of motion in his neck, without any significant limitations. (Tr. at 539). Although Plaintiff complained of back pain, Dr. Marek

---

[6] A straight leg raise test can be used to diagnose a herniated disc in the lower back. *See,* MOSBY'S at 1546.
[7] There are no records for these injections. The injections by Dr. Sanchez were completed in July, 2004. (Tr. at 365).

saw no evidence of a neurological deficit in his spine. (Tr. at 535). Dr. Marek prescribed naproxen and gabapentin for the back pain.[8] (Tr. at 535).

On December 1, 2008, Plaintiff returned to the VA clinic for treatment. (Tr. at 531). During this visit, Dr. Marek reported that Barraza did not have any weakness, numbness, or tingling in his extremities, and he saw no sign of any motor or sensory deficits. (Tr. at 532, 533). The doctor also noted that Plaintiff's "walking distance [was] not limited." (Tr. at 532). Plaintiff was prescribed naproxen and gabapentin for pain and inflammation, and continued on medication for high cholesterol and high blood pressure. (Tr. at 532). He was referred to the nutrition clinic for help with his diet and weight loss, but he did not attend that appointment. (Tr. at 530).

On April 1, 2009, Plaintiff was seen again at the VA clinic. (Tr. at 524). He complained of pain on the left side of his body. (Tr. at 523). Dr. Marek found no neurological deficits and no motor or sensory deficits during his examination of Plaintiff. (Tr. at 525-526). Plaintiff told the doctor that he was not taking his pain medication, but instead occasionally used his wife's Vicodin. (Tr. at 526). Dr. Marek prescribed gabapentin and started Plaintiff again on Piroxicam in place of naproxen. (Tr.at 523, 526).

Dr. John Samuel ordered an echocardiogram on July 7, 2009. (Tr. at 432). The right ventricle of Plaintiff's heart was found to be enlarged, and he had mild mitral valve regurgitation, but there were no other abnormalities found. (Tr. at 432). A treadmill exercise stress test did not show any problems with the function of his heart during exercise. (Tr. at 433). An x-ray of the cervical spine was interpreted to show degenerative disc disease throughout the spine, as well as narrowing of the neural foramen on the right side at C3-C4, C4-C5, and both

---

[8] Naproxen is a nonsteroidal anti-inflammatory used for arthritis, and gabapentin is used to control some types of nerve pain. Mosby's at 1079.

sides at C5-C6. (Tr. at 428). A lumber spine x-ray showed degenerative changes throughout the lower back, with disc space narrowing and osteophytes. (Tr. at 427). Later that month, Plaintiff described a history of back pain and numbness/tingling in his arms to Dr. Asha Samuel ("Dr. Samuel"). (Tr. at 415). He also complained of pain in both of his arms and shoulders, his left hip, and his left leg. (Tr. at 410). On September 14, 2009, he again complained of left hip pain. Dr. Samuel treated these complaints with Celebrex. (Tr. at 407). On October 19, 2009, Barraza complained that his "whole body hurt." (Tr. at 406). Plaintiff went back to the VA clinic nine days later, on October 28, 2009. (Tr. at 520). At that time, he complained of pain in his left arm and hand. (Tr. at 515). He did not complain of any acute episodes of back pain during this visit. (Tr. at 516). His medications were changed to Tramadol, cyclobenzaprine, and Celebrex.[9] (Tr. at 516).

On November 11, 2009, Plaintiff saw Dr. Samuel after two days of severe back pain that radiated to his left leg. (Tr. at 405). He told Dr. Samuel that he did not have numbness or weakness in his leg, but he described his pain to be at a level of "8 to 9 out of 10." (Tr. at 405). X-rays of the lumbar spine were similar to the previous films and showed degenerative disc disease throughout the lower back, but worsening at the L1-L2 and L2-L3 levels. Dr. Samuel prescribed Flexeril and Ultram and referred him to a pain management doctor. (Tr. at 405). Two weeks later he returned to Dr. Samuel for a follow up examination. (Tr. at 404). He told Dr. Samuel that his back was better, but there is no indication that he had seen a pain management doctor. (*Id.*). The records from this treatment show that Plaintiff told Dr. Samuel the "spine surgeon wants [him] to lose weight."[10] (Tr. at 404).

---

[9] Tramadol is a narcotic pain reliever. Cyclobenzaprine is a muscle relaxant. Celebrex is a non-steroidal anti-inflammatory used to treat arthritis.

[10] This is the only reference to spinal surgery in the record.

On April 5, 2010, Plaintiff complained to Dr. Samuel that he had low back pain and intermittent shoulder pain. (Tr. at 403). Barraza wanted Dr. Samuel to refill the prescriptions for Celebrex, Flexeril, and Tramadol. (Tr. at 403). Dr. Samuel diagnosed "degenerative disc disease" of the spine, told Plaintiff to exercise, and refilled his prescriptions. (Tr. at 403). On September 10, 2010, Plaintiff bent over to lift a basket of laundry when he felt a shooting pain in his lower back and right leg. (Tr. at 402). He saw Dr. Samuel four days later, and the doctor continued the prescriptions for Flexeril and Celebrex. (*Id.*). Plaintiff was then seen at the VA clinic on August 31, 2010. (Tr. at 514). During this visit, he complained of pain in his left arm and hand. (*Id.*). Although his history of chronic back pain was included in a list of "active problems," Plaintiff listed only medications for depression, high blood pressure, and high cholesterol, and did not list Flexeril or Celebrex, when identifying his current medications. (Tr. at 514). Dr. Utpal Ghosh told Plaintiff to take ibuprofen for the hand pain, and also prescribed Celebrex, Tramadol, and Flexeril for his back pain. (Tr. at 515).

Barraza returned to Dr. Samuel on October 14, 2010, to review the results of blood tests to monitor his high cholesterol and hypertension. (Tr. at 401). He complained of low back pain at this visit. (Tr. at 401). The following month, on November 23, 2010, Plaintiff told Dr. Samuel that his lower back hurt, and the pain radiated into both legs. (Tr. at 399). Dr. Samuel reported that Plaintiff was not in any distress and did not want to see an orthopedic doctor, but instead wanted to return to pain management. (Tr. at 399). Plaintiff was continued on Tramadol and Flexeril, as well as the medications for high cholesterol and hypertension. (Tr. at 399). Dr. Samuel then sent Plaintiff to see Soraya Hoover, M.D. ("Dr. Hoover"), because he was having difficulty in sleeping. (Tr. at 370). Dr. Hoover diagnosed a deviated septum, and Plaintiff had surgery to correct that problem on November 4, 2010. (Tr. at 370). Plaintiff saw Dr. Samuel on

March 7, 2012, for ongoing pain in his back, shoulder, hip and knee. (Tr. at 392). Plaintiff was "not in any distress," and Dr. Samuel did not find any neurological deficits. (Tr. at 392). The doctor told Plaintiff to exercise, and continued his pain medications. (Tr. at 392).

On May 14, 2012, Barraza was examined by Dr. Manoj Vakil ("Dr. Vakil"), a doctor of internal medicine acting on behalf of the state. (Tr. at 455-457). Plaintiff told Dr. Vakil that his neck and back pain began five years earlier. (Tr. at 455). He claimed that his low back pain was getting worse, and he described it as a constant dull pain that radiates into his legs. (Tr. at 455). He also said that his neck and upper back pain radiates into his shoulders and arms. (*Id.*). Plaintiff explained that his back pain worsens if he sits in one position for more than 20 minutes, or if he lifts objects weighing more than 30 pounds. (Tr. at 455). Plaintiff was able to walk on his toes and heels, and could get on and off the examination table without help. (Tr. at 456). Dr. Vakil examined Plaintiff's spine and said that Barraza had a normal range of motion in both his neck and lower back, with no indications of any muscle spasms. (Tr. at 456-457). Plaintiff also had the full range of motion in his hips, knees, ankles, elbows, shoulders and wrists. (Tr. at 457). A straight leg raising test was negative, and there was no muscle atrophy, loss of sensation, or loss of reflex. (Tr. at 456-457). Barraza could squat, but he could not hop, because of his back pain. (Tr. at 457). He told Dr. Vakil that he is able to drive, and that he helps his wife cook and clean the house. (Tr. at 455). An x-ray of the lumbar spine was interpreted by Dr. Ali Salehi, a radiologist, to show mild degenerative changes and bony spondylosis in the lumbar spine. (Tr. at 459). An EKG showed non-specific ST-T wave changes, a finding that ruled out a past heart attack, but not other primary or secondary heart problems. (Tr. at 457). From this examination, Dr. Vakil concluded that Plaintiff is able to sit, stand, move around, and lift and carry objects weighing up to thirty pounds without any problem. (Tr. at 457).

Using Dr. Vakil's report from this examination, Dr. Hajra Madani ("Dr. Madani"), an internal medicine doctor acting on behalf of the state, prepared an evaluation of Barraza's physical residual functional capacity. (Tr. at 461-468). Dr. Madani listed "mild lumbar degenerative disc disease" and high cholesterol as the diagnoses for Plaintiff. (Tr. at 461). She found that Plaintiff could occasionally lift or carry items weighing up to fifty pounds, and could frequently lift or carry items weighing up to twenty-five pounds. (Tr. at 462). She also found that he could stand and/or walk for about six hours in an eight hour work day; he could sit for the same amount of time; and that he could perform an unlimited amount of pushing and pulling, within the weight limitations previously stated. (Tr. at 462). Dr. Madani found that Barraza had no postural limitations, no manipulative limitations, no visual limitations, no communication limitations, and no environmental limitations. (Tr. at 463-465). Dr. Madani determined that the alleged severity and limiting effects of Plaintiff's impairments were not fully supported by the medical evidence. (Tr. at 545). Dr. Madani also said that it was reasonable to assume that Plaintiff had the same level of function for the six month period before Dr. Vakil's examination. (Tr. at 468).

Dr. Roberta Herman, an internist retained by the state, reviewed the conclusions by Dr. Vakil and Dr. Madani, on September 4, 2012, during the reconsideration of Plaintiff's claim for disability benefits. (Tr. at 474). Dr. Herman agreed with their findings, and pointed out that Plaintiff had not followed up with a doctor for his back pain since the examination by Dr. Vakil. (Tr. at 474).

### Educational Background, Work History, and Present Age

At the time of the hearing, Barraza was 54 years old. (Tr. at 54, 484). He had dropped out of high school in the eighth grade, had joined the job corps, and had earned his GED. He

then joined the United States Navy as a machinist in 1981.  (Tr. at 56, 144, 58, 538).  He served in the Navy for twenty years, during which he was stationed overseas in the Persian Gulf War.  (*Id.*).  He was honorably discharged from the Navy on April 30, 2001.  (*Id.*).  He received a 10% service connected disability rating for tinnitus caused by his service in the military.  (Tr. at 515).  After leaving the Navy, he worked as a machinist for Baker Oil from 2001 until 2005.  (Tr. at 182).  He then worked as a security guard for five months before going to work at Lennox, where he assembled air conditioning units.  (Tr. at 182).  He returned to work as a security guard in May, 2006, and continued in that position until March, 2007, when he stopped working altogether.  (Tr. at 182).

### *Subjective Complaints*

Barraza claims that he has been unable to work since February 16, 2007, because of arthritis in his neck, back, shoulders and knees.  (Tr. at 144, 190).  He explained that his neck stiffens up, begins to hurt, and the pain then spreads through both shoulders and down his arms, and he cannot grasp or hold his gun.  (Tr. at 62-63).  He does not have any trouble raising his arms above shoulder level, but his hand cramps if he writes more than a few lines, or types for more than five minutes.  (Tr. at 66-67).

He also has daily pain in his lower back that is only partially relieved by the medications that he takes.  (Tr. at 65).  Because of his lower back pain, he is not able to bend over to pick up objects off the floor or walk long distances.  He said that his back pain is the primary reason he is not able to work, because he is not able to walk around the property and the parking lot.  (Tr. at 64, 68).  Plaintiff tries to use Vicodin only at night to help him sleep, because he is worried about becoming addicted.  (Tr. at 65-66).  To cope with back pain during the day, he adjusts his sitting

position, and will also lie down once or twice for an hour or more. (Tr. at 66). He sleeps in a loveseat, and has to change his position every couple of hours, because of his back pain. (Tr. at 64). Barraza told the ALJ that his doctors have recommended surgery to "open up the nerve canals" in his back, but he said that it is a risky surgery that could make his condition worse. (Tr. at 64).

Plaintiff's attorney described a "serious breathing problem" and a sleep disorder in the list of health problems which plague Barraza. (Tr. at 56-57). Barraza clarified, however, that he has trouble sleeping because of his back pain, not because of sleep apnea. (Tr. at 64, 67). He further acknowledged that after sinus surgery in 2010, he no longer required a constant positive air pressure (CPAP) machine at night. (Tr. at 68).

Barraza reported that he is able to do most activities, but that any activity may cause his back pain to worsen. (Tr. at 195). He is able to drive approximately twenty miles before his back begins to hurt. (Tr. at 70, 193). He is able to cook, but doing dishes and laundry is difficult, because those tasks require him to carry heavy baskets and to bend down. (Tr. at 70). He is able to shop for groceries, but he usually relies on his wife to complete that task, because he has trouble walking through the store. (Tr. at 70, 193). He mows the backyard, occasionally stopping to rest, and his wife mows the front yard. (Tr. at 70, 192). He added that he likes to watch television and to read, but holding a book causes his hand and arm to hurt. (Tr. at 71, 194). Even though he has problems with his hands, he does not wear hand or wrist braces. (Tr. at 82). At the time of the hearing, Plaintiff was taking Vicodin and Zanaflex[11] for his neck and

---

[11] Zanaflex is a muscle relaxer. It was prescribed by Dr. Anjali Jain. There are no records from Dr. Jain's treatment. (Tr. at 247).

back pain, Norvasc and Simvastin for high cholesterol and high blood pressure, and Protonix.[12] (Tr. at 247-248).

### *Expert Testimony*

The ALJ also heard testimony from Robert Smiley, M.D., a retired thoracic and vascular surgeon. (Tr. at 71). Dr. Smiley explained that Plaintiff has mild cervical spondylosis, a condition which causes pain in the neck and arms. (Tr. at 71). However, Dr. Smiley testified that there are "very few, if any, objective . . . abnormal physical findings on his physical examinations." (Tr. at 72-73). Plaintiff also has lumbar spondylosis with a small disc herniation at L5-S1. (Tr. at 72). This causes Plaintiff to suffer from pain in his back. (Tr. at 72). His low back pain prevents an ability to hop, but, there are no other limitations described by his treating doctors. (Tr. at 73). Dr. Smiley said that, although Plaintiff's hypertension is poorly controlled, there is no evidence of organ damage. (Tr. at 73). Dr. Smiley did not find any support in the medical records for Plaintiff's testimony that he continues to have problems with both hands because of carpal tunnel syndrome. (Tr. at 73, 74).

Dr. Smiley then described the limitations on Barraza's ability to function in the work setting because of his health impairments. (Tr. at 73). He "had to debate between light [work] and sedentary [work]." (Tr. at 73). Dr. Smiley was instructed by the ALJ to first consider only the medical records, and not Plaintiff's testimony:

> A.    I think the six hours standing or walking requirement for light [duty] is going to be tough for him to do on a sustained, regular basis, so I think I should put him at light. I mean sedentary.
>
> Q.    Well, what about doing it for four hours instead of six?
>
> A.    Well, the problem, of course, with these records is that we don't have anything even approaching a functional capacity evaluation. So the true answer is I don't

---

[12] Protonix is used to treat ulcers and gastroesophageal reflux disease. It was prescribed by Dr. Atif Shahzad, but there are no records from Dr. Shahzad's treatment. (Tr. at 247).

know if he can do four hours.  I'm pretty sure he can't do six.  I think he can do two.  Four, true answer is I don't know.

Q.      Okay.  Well, there's a lot we don't know in medicine that we have to use the concept of reasonable medical probability.[13]  Think he could probably do four?

A.      Yes.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Q.      What about how much could he lift and carry?

A.      I think he could probably fill the requirements for light in that area. . . . 20 pounds occasionally . . . and 10 frequently.

Q.      . . . [D]oes [he] have any environmental restrictions?

A.      Yes, with his hands he would be limited in his ability to finger, handle, -- on a sustained or regular basis.

Q.      How so?

A.      Because –

Q.      Well, let me back you up there.  I though you said we don't have anything on his hands?

A.      We don't.

Q.      So why would you say he would have a limit?

A.      Again, because I heard his testimony.

Q.      Okay.  Well, based upon the record, does he have any limits on his hands?

A.      . . .  I didn't see anything in the record about the, the use of his hands.

Q.      But obviously he would if we based it on what he testified?

A.      Yes.

Q.      [If] we base it on that, would you limit it to occasional?

A.      Yes.

Q.      Any other environmental restrictions?

[13]  Barraza's attorney objected to the ALJ's questions, but was overruled.  The ALJ defined reasonable medical probability to be more likely true than not, using established principles of medicine.  (Tr. at 75).

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> A.      He – well, no ladders, scaffolds, unprotected heights.  It would not be a good idea for him to be around hazardous or moving machinery.  Stair climbing, maybe one flight occasionally.  Squatting, kneeling, stooping, crawling at most occasional.

(Tr. at 74-77).  Plaintiff's attorney declined the opportunity to cross-examine Dr. Smiley.  (Tr. at 77).

The ALJ also heard testimony from Ms. Kay Gilreath, a vocational expert witness.  (Tr. at 77-83).  She first described Bazzara's prior work experience.  (Tr. at 78).  Plaintiff had worked as a machine repairer in the Navy, which is "heavy," in exertional level, and "skilled."  (Tr. at 78).  His work as a lathe operator was "medium, skilled," and his job as an air conditioning system assembler was "medium, semi-skilled."  (Tr. at 78).  His final position as a security guard was "light, semi-skilled."  (Tr. at 78).  Following her summary, the ALJ posed a series of hypothetical questions to Ms. Gilreath, to assess Barraza's ability to continue to work:

> Q      [A]ssume with me a person of the same age, education, and vocational background as the claimant, and further assume with me the following. Hypothetical number one, such a person could stand and/or walk about 4 hours in an 8-hour work day, sit about 6 hours in an 8-hour work day; lift or carry 10 pounds frequently and 20 pounds occasionally; no working at unprotected heights or in proximity to dangerous or moving machinery; no climbing ropes, ladders, or scaffolds; can negotiate stairs and ramps but only one flight on an occasional basis; squatting, kneeling, stooping, and crawling is limited to only occasional.  Could that person do any of the claimant's past work?
>
> A      Well, I'd have to ask him about the security guard position that he did.  I don't know --.
>
> Q      [to Barraza]  How much walking did you have to do in that job?
>
> A      [Barraza] Quite a bit.  I had to make my rounds every hour at the Holiday Inn, check the parking lot, check the lobby.  I was supposed to walk – it was like a six hour shift.  I quit because I couldn't make my rounds and I couldn't hold my gun.  My hands would swell up and I couldn't tell how hard I was gripping my gun.  . . . . I was – it was a danger to me and the people around me if I couldn't hold my gun if somebody broke in.

22

A        [Gilreath]  I'd say he couldn't, if he was a commissioned officer.  And what, what he was doing walking.  So as he performed that job, no.

Q.        What about as performed in the economy?

A.        Well, security guard is such a broad – there's so many of them.  There's certainly a significant number that you could fall within that hypothetical.

Q.        Well, as generally performed in the economy?  The job that he had, could he do?

A        Okay.  Within that hypothetical given there were no -- restrictions given on the hand.  I would say yes.

Q.        Okay.  Hypothetical number two, same as hypothetical number one, but this time add only occasional grasping and fine fingering.  Could that person do the claimant's past work?

A.        No.

Q.        Are there any jobs in the economy such a person could do? . . .

A.        Well, I think one could be a gate guard with that hypothetical . . . which is light, semi-skilled at three [with over 5,000 jobs in Texas and 100,000 nationally.]
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
            Parking lot attending, which is light, unskilled at two [with 3,000 position in Texas, 25,000 nationally] . . . [and] ticket sellers, which are light, unskilled at two [with 8,000 positions in Texas and over 100,000 nationally] . . .

Q.        Hypothetical number three, same as hypothetical number two, but this time reduce the amount of standing or walking to two hours.  Any jobs?

A.        Not utilizing transferable skills.  You would look at sedentary, unskilled.

                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

A.        Wait, wait.  If you're reducing to sedentary, you're going to need at least a frequent grasping and fingering.

Q.        There'd be no jobs?

A.        No jobs.

Q.        Okay.  Hypothetical number four. . . .Same as hypo[thetical] number one. So we're back up to the four hours standing or walking, but this time . . .

we don't have the limits on manipulation and the use of hands, [but] reduce the amount of standing or walking to two hours. Any jobs?

A.     . . . I would look at sedentary, unskilled.

Q.     Only sedentary?

A.     (no audible response)

Q.     Okay. That's fine. Hypothetical number five, with regard to number – hypo number one or hypo two, if the person required two unscheduled breaks a day lasting about an hour-and-a-half each, would there be any jobs?

A.     No.

(Tr. at 78-82). Barraza's attorney did not question the vocational expert witness. (Tr. at 66).

### *The ALJ's Decision*

Following the hearing, the ALJ made his written findings on the evidence. From his review of the record, he determined that Barraza was suffering from degenerative disc disease of the cervical and lumbar spine, hypertension, and obesity, and that those impairments were severe. (Tr. at 29). He also considered Plaintiff's complaints regarding his hands. (Tr. at 31). The ALJ pointed out that there was no objective medical evidence showing that Plaintiff had any current limitations to his hands. From this, he concluded that there was no severe impairment due to carpal tunnel syndrome, and that such a condition would not be expected to interfere with Barraza's ability to work. (Tr. at 31). The ALJ, however, did consider Plaintiff's complaints about his hands when determining his residual functional capacity. (Tr. at 31).

The ALJ next decided that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (Tr. at 31-32). The ALJ explained that Plaintiff's cervical spondylosis did not satisfy the criteria to be considered disabling because there was no evidence of nerve root compression in the neck that

caused pain, with motor loss, and sensory or reflex loss. (Tr. at 32). Plaintiff's lumbar herniation did not satisfy the criteria because there was no positive straight leg raise test or evidence of nerve root compression. (Tr. at 32). The ALJ reasoned that Plaintiff was able to do all of the requested activities during the physical examination with the exception of hopping. (Tr. at 32). Even though Plaintiff's hypertension is uncontrolled, it has not significantly affected his health. (Tr. at 32).

In assessing Plaintiff's residual functional capacity, the ALJ determined that Barraza is capable of performing light work, and he can frequently lift and carry objects weighing up to ten pounds, or occasionally lift and carry objects weighing up to twenty pounds. (Tr. at 32). Plaintiff can stand or walk for four hours in an eight hour work day, and to sit for up to six hours. (Tr. at 32). He cannot work at unprotected heights, or around moving or dangerous machinery, or at a job that requires climbing stairs on more than an occasional basis. (Tr. at 32). Based on the medical records and the testimony from Dr. Smiley and Ms. Gilreath, the ALJ found that Barraza was capable of performing his past relevant work as a security guard, as that job is generally performed in the economy. (Tr. at 34-35). For that reason, the ALJ concluded that Plaintiff is "not [] under a disability, as defined in the Social Security Act," and he denied his application for benefits. (Tr. at 35).

Barraza complains that the ALJ erred when he decided that his carpal tunnel syndrome is not a severe impairment, and also when he did not include any limitation on the use of his hands when evaluating his residual functional capacity. (Plaintiff's Motion at 6). Barraza also argues that the medical expert testified that Plaintiff was capable of doing only "sedentary" work, so that the ALJ erred when he concluded that he has the residual functional capacity to do "light" work. (*Id.* at 6). Plaintiff also contends that the ALJ was wrong to conclude that he could

perform his past relevant work as a security guard, because the limitations found by the ALJ are inconsistent with the job duties of a security guard. In response, the Commissioner contends that the ALJ's decision is supported at each step of his evaluation by substantial evidence, and should be affirmed. (Defendant's Motion at 4).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

### *Carpal Tunnel Syndrome*

Plaintiff argues that he continues to have difficulty holding and gripping objects with both hands due to carpal tunnel syndrome, and that condition severely impairs his ability to function and to work.[14] (Plaintiff's Motion at 6-9). He testified that he stopped working as a security guard, in part, because his hands swell which affects his ability to hold a firearm. (Tr. at 79). He insists that his hands cramp if he holds a pen to write, and he can only write three pages before he must rest for thirty minutes. (Tr. at 66). However, the ALJ did not find Plaintiff's testimony on the severity of his carpal tunnel symptoms to be entirely credible. (Tr. at 34).

In any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). However, there is no question that an ALJ has discretion to weigh the credibility of the

---

[14] In his motion, Barraza also points to Dr. Janvashir's records which discuss cervical neuritis with left upper extremity polyradiculopathy and cervical osteoarthritis to support his contention that his carpal tunnel syndrome is a severe impairment. (Plaintiff's Motion at 8-10).

testimony presented.  *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988).  In fact, an ALJ is free to accept or reject a claimant's subjective statements, so long as the reasons for doing so are made clear.  *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *Hollis*, 837 F.2d at 1385; SOCIAL SECURITY RULING ("SSR") 96–7p, 1996 SSR LEXIS 4, at *2–4.  Such credibility findings "are precisely the kinds of determinations that the ALJ is best positioned to make."  *Falco*, 27 F.3d at 164.  As such, they are "entitled to considerable judicial deference."  *Haywood v. Sullivan*, 888 F.2d 1463, 1470 (5th Cir. 1989); *James*, 793 F.2d at 706.

In his written opinion, the ALJ considered Plaintiff's testimony, but explained that there was "no objective medical evidence showing that [Plaintiff's] hands are limited."  (Tr. at 31).  Plaintiff's carpal tunnel syndrome was treated surgically in 2003, on his left hand, and in 2006, on his right hand.  (Tr. at 33, 508-511, 518).  After each surgery, Plaintiff was able to return to work, and his ability to resume working is not consistent with an ongoing, severe impairment, according to the ALJ.  (Tr. at 33, 62-63).  While Plaintiff complained of neck pain radiating into both arms, the ALJ pointed out that his physical examinations were usually benign.  (Tr. at 34).  Plaintiff had normal reflexes, normal sensory functions, and full ranges of motion in the elbows, wrists, hands and fingers when he was seen by the state examiner, Dr. Vakil.  (Tr. at 34, 456-457).  Plaintiff's treating physician, Dr. Janvashir, also reported normal reflexes and sensory functions in his extremities.  (Tr. at 34, 316).  Another treating physician, Dr. Samuel, saw no clubbing or edema in any of Plaintiff's extremities.  (Tr. at 34, 493).

The ALJ concluded that Plaintiff did not have a severe impairment in his hands.  The ALJ pointed out that no treating doctor has ever identified any limitations or restrictions in Plaintiff's hands.  (Tr. at 31, 34).  The medical records contain only a few references to specific

complaints about his hands after Plaintiff had the carpal tunnel surgeries, and not one of his treating physicians has ever identified any ongoing problems with his hands from carpal tunnel syndrome.[15] No doctor has recommended any additional treatment for his hand complaints. Indeed, Plaintiff does not use a hand or wrist brace, although one was prescribed for him. (Tr. at 82, 527).

Here, it is clear that the ALJ considered both subjective and objective evidence in assessing Plaintiff's credibility. *See Wingo*, 852 F.2d at 830. In questioning Plaintiff's testimony that the use of his hands was limited, the ALJ made specific references to the objective medical evidence and the opinions from the medical experts. *See Falco*, 27 F.3d at 164; *Hollis*, 837 F.2d at 1385; SSR 96–7p. As a result, the ALJ complied with the law in assessing Barraza's credibility, and his decision is entitled to considerable deference. *See Villa*, 895 F.2d at 1024; *Hollis*, 837 F.2d at 1385. Plaintiff presented no evidence that he has received any medical treatment for his hands because of carpal tunnel syndrome after he had surgery. Because of that, the ALJ's determination that Plaintiff's carpal tunnel syndrome is not a severe impairment is supported by substantial evidence.

Barraza further argues that the ALJ did not take into account his carpal tunnel syndrome when he determined that he has the residual functional capacity to do light work. (Plaintiff's Motion at 11). The ALJ's decision, however, describes Plaintiff's carpal tunnel syndrome and treatment, as well as his assessment of his credibility, to support the findings on Barraza's residual functional capacity. (Tr. at 32-34). It is clear that the ALJ did consider Plaintiff's

---

[15] Plaintiff complained of pain, tingling and the sensation of pins and needles in his left arm, forearm, and hand in 2006 to Dr. Janvashir. (Tr. at 314). The ALJ pointed out, however, that Plaintiff's reflexes, senses, and motor responses were normal at that visit. (Tr. at 315-316). Barraza also complained of left hand pain at the VA hospital in August, 2010. (Tr. at 514). The treating physician diagnosed a "likely tendon pull." (Tr. at 516). Plaintiff told his treating doctor in October, 2009, that he was not working because of "hand numbness and back pain." (Tr. at 521). The physician saw no neural or sensory deficits, and also wrote that Plaintiff was not taking the pain medications that were prescribed for his back pain, but instead was occasionally taking his wife's Vicodin. (Tr. at 521-526).

complaints of hand pain and swelling from carpal tunnel syndrome. The ALJ decided that Plaintiff's subjective complaints of swelling, pain and numbness in his hands, which he said affected his ability to write, type, or grasp a firearm, were not entirely credible, when there was no objective evidence supporting these claims. The ALJ's decision not to include any limitations because of carpal tunnel syndrome is supported by substantial evidence.

### Residual Functional Capacity Finding

Plaintiff also contends that the ALJ erred when he concluded that Barraza retained the residual functional capacity to perform "light work." (Plaintiff's Motion at 11-16). Barraza insists that Dr. Smiley placed him at a sedentary level of activity, and so he is not capable of performing any light work. (Plaintiff's Motion at 13). Barraza also argues that the limitations placed on him by the ALJ prove that he is not able to return to his prior work as a security guard. (Plaintiff's Motion at 15). Barraza argues that a security guard position is "light work" and requires one to stand or walk approximately five to six hours a day, and to "frequently" walk or run. (*Id.*). Because the ALJ determined that he can stand and walk for only four hours in a work day, Plaintiff insists that he is physically incapable of working as a security guard. (*Id.*). Barraza also argues that the vocational expert witness determined that he could not perform his past work as a security guard, because he is limited in his ability to handle objects or use his fingers on a sustained basis. He contends that the ALJ should have determined that he could do those tasks only on an occasional basis. (Plaintiff's Motion at 14, Tr. at 75-77). Because of this, Barraza insists that the ALJ erred in his residual functional capacity finding, and was wrong to conclude that he can return to his previous job as a security guard. (Plaintiff's Motion at 12).

The Commissioner concedes that Dr. Smiley "testified that Plaintiff was limited to sedentary work." (Defendant's Response at 5). Even so, argues Defendant, the ALJ is not

required to incorporate any specific limitation into his RFC assessment, but only those that are supported by the record. (Defendant's Response at 4). The Commissioner contends that the record, as a whole, supports the ALJ's RFC assessment for a restricted range of light work, and that the ALJ rightfully incorporated Dr. Smiley's opinion that Plaintiff could stand or walk for four hours in an eight-hour day.

Plaintiff's "residual functional capacity" is "the most [he] can still do after considering the physical and mental limitations that affect the ability to perform work-related tasks." *Ray v. Barnhart*, 163 Fed. Appx. 308, 312 n.6 (5th Cir. 2006) (citing 20 C.F.R. § 416.945(a)(1)); *see Myers*, 238 F.3d at 620. The ALJ is responsible for determining an applicant's residual functional capacity. See 20 C.F.R. § 404.1546(c); *Dise v. Colvin*, 630 F. App'x 322, 325 (5th Cir. 2015). "[T]he ALJ, as a lay fact finder, lacks sufficient expertise to conclude that a claimant has the abilities to perform certain tasks, and rather an explanation of the claimant's residual functional capacity from a physician is needed." *Johnson v. Barnhart*, 285 F.Supp.2d 899, 910 (S.D.Tex. 2003) (citing *Rivera-Torres v. Secretary of Health and Human Services*, 837 F.2d 4, 7 (1st Cir. 1988). The ALJ should request a medical source statement describing the types of work that an applicant is still capable of performing. *See, Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). The absence of a medical source statement does not, by itself, make the record incomplete, but the decision of the ALJ must be supported by substantial evidence. *Id.* The testimony of a medical expert, as long as it does not contradict the findings of an examining physician, is substantial evidence in support of the ALJ's RFC determination. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

Central to the ALJ's decision that Barraza is not disabled is his determination that he has the residual functional capacity to perform light work, with the additional limitation that he can

stand and/or walk for only about four hours in an eight hour workday. (Tr. at 32). If there is substantial evidence to support these limitations, the ALJ's decision will not be disturbed. In reaching this determination, the ALJ explained that he considered Barraza's subjective complaints. (Tr. at 33). The ALJ considered Barraza's testimony that he has back pain throughout the day with only some relief from medication, that he must change his sitting position frequently, and that he must lie down twice a day for one-and-a-half to two hours. (Tr. at 33). The ALJ also acknowledged Plaintiff's testimony that he cannot carry a load of laundry, can drive only a short distance before his back aches, and is not able to walk around the grocery store. (Tr. at 33).

The ALJ agreed that Barraza's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but he believed that those symptoms were not as severe as Plaintiff claimed. (Tr. at 33-34). He explained that when Plaintiff was examined by Dr. Vakil, the results were almost entirely normal, with normal reflexes, a normal gait, and normal range of motion in his neck and back. (Tr. at 34). Plaintiff was able to walk without assistance, and climb on and off the examination table without help. (Tr. at 456). There was no sign of muscle weakness or atrophy. (Tr. at 457). Dr. Vakil concluded that Barraza was able to sit, stand, and walk, as well as lift, carry and handle objects weighing up to thirty pounds, without any problems. (Tr. at 457). Plaintiff was diagnosed with mild degenerative disc disease of the cervical and lumbar spine, but there was no evidence that he suffered from nerve root compression at any level. (Tr. at 32). The ALJ also considered the Physical Residual Functional Capacity Assessment that had been completed by Hajra Madani, M.D., who found that Plaintiff could stand or walk for up to six hours, and could lift items weighing up to fifty pounds. (Tr. at 34, 461, 474).

During the hearing before the ALJ, Dr. Smiley testified that Plaintiff could fulfill all of the requirements for light duty work, except that he can stand or walk for only four hours; that he should be restricted from heights and climbing; that he must avoid hazardous machinery; that he can climb one flight of stairs only occasionally; and that he can only occasionally squat, kneel, stoop or crawl. (Tr. at 74-77). In detailing these limitations, Dr. Smiley stated that he would "probably" limit Plaintiff to sedentary work, because Barraza was not able to stand or walk for six hours in a day. (Tr. at 74). Dr. Smiley then testified that Plaintiff could probably stand or walk for four hours in a work day, and he could otherwise fulfill the requirements for "light work." (Tr. at 74). Dr. Smiley explained that, even though there was no functional capacity evaluation assessing Barraza's ability to walk or stand, Dr. Vakil's examination of Plaintiff was "normal." (Tr. at 75-76). Dr. Smiley agreed with Dr. Vakil and Dr. Madani that Plaintiff could perform all of the lifting and carrying requirements for "light work," but thought that he was more restricted in his ability to stand and walk than they. The ALJ considered the opinions from each of the consulting examiners, accorded "the greatest consideration supported by the record" to Barraza's subjective complaints, found him able to do "light work," but limited him to standing or walking for no more than four hours in a day. (Tr. at 34).

This finding by the ALJ is supported by substantial evidence. As explained by the ALJ, although the evidence did support a finding of some limitations on Plaintiff's ability to do certain tasks, there is no evidence in the medical records, nor is there any opinion from any of Plaintiff's treating doctors, that he has any limitation on his ability to stand or walk. Instead, Dr. Marek, one of his treating physicians, said that there was no limit on the distances that he could walk. (Tr. at 532). Plaintiff does not use a cane, he has a walker that he does not use, and there is no evidence that he has muscle weakness, nerve impingement, or that he suffers from any

imbalance.[16]  Plaintiff provided no objective medical evidence that his ability to walk is limited in any way.  The ALJ considered Plaintiff's testimony regarding his back pain, the diagnosis of mild spondylosis, and the effect of that back pain on his ability to walk.  He then agreed with Dr. Smiley, that based on reasonable medical probability, Barraza can probably stand and walk for four hours.  That finding is consistent with, and supported by, the objective medical evidence. Dr. Smiley also testified that Plaintiff could fulfill the light duty requirements for lifting and carrying objects weighing up to twenty pounds occasionally, and objects weighing up to ten pounds frequently.  (Tr. at 76).  There is no evidence, or medical opinion, which contradicts Dr. Smiley's testimony on this point.  Plaintiff himself admitted that he can lift items weighing up to thirty pounds without pain.  (Tr. at 455).  Dr. Smiley also found no evidence in the medical records, that Plaintiff's ability to handle objects or use his fingers was limited, and Barraza has produced none.  Dr. Smiley said that he would limit those tasks to occasional only if the ALJ found Plaintiff's complaints credible, which the ALJ did not.  (Tr. at 77).  Because of that, the ALJ's residual functional capacity finding is supported by substantial evidence.

Plaintiff further contends that the ALJ's decision that his residual functional capacity allows him to work as a security guard is wrong, because the DOT description of the position shows that security guards must stand or walk approximately five to six hours a day, and that walking or running is a frequent activity.  (Plaintiff's Motion at 15).  The ALJ's finding that Barraza can stand or walk for only four hours in a day does not, however, preclude a finding that he still has the functional capacity to work as a security guard.  A security guard position is "light work" that can require "walking or standing to a significant degree" or carrying up to ten

---

[16] Plaintiff testified, "I have a walker but I don't use it.  I don't really need it because I just go from the living room to the bedroom, and it's not that far."

pounds frequently.  (DOT Part A, 04.02.02, 372.667-034; DOT Appendix C at C-2).  "Light

work" includes:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls.

20 C.F.R. § 404.1567(b)).  Social Security Ruling (SSR) 83-10 clarifies the requirements of

"light work."[17]  Light work requires the ability to frequently lift and carry objects weighing up to

ten pounds.  It explains that "frequent" means from one-third to two-thirds of the time.  "Since

frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full

range of light work requires standing or walking, off and on, for a total of approximately six

hours of an eight hour workday."  (SSR 83-12).

In this case, it is clear that Plaintiff is not able to work in the "full range" of positions for

a security guard, because he is not able to stand or walk for a full six hours in a work day.  It

does not, however, follow that Plaintiff is unable to do any "light work," or that he is not able to

work at all as a security guard.  The DOT job descriptions are not necessarily determinative.

*Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir.2000) ("DOT job descriptions should not be given a

role that is exclusive of more specific vocational expert testimony with respect to the effect of an

individual claimant's limitations on his or her ability to perform a particular job.").  SSR ruling

00–4p specifically recognizes that the DOT lists the maximum requirements of occupations as

generally performed, while a vocational expert can describe more specific information about a

job or occupation.  *See* Social Security Ruling 00–4p.  The Fifth Circuit has acknowledged the

---

[17]  Social Security Administration Rulings ("SSR") are not binding on the court, "but they may be consulted when
the statute at issue provides little guidance." *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (citing *B.B. ex. rel.
A.L.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981).  The Fifth Circuit has relied upon the SSR in evaluating
ALJs' decisions. *See Newton*, 209 F.3d at 456 (relying on SSR 96-2p); *Scott v. Shalala*, 30 F.3d 33, 34 (5th
Cir.1994)(relying on SSR 83-12); *Spellman v. Shalala*, 1 F.3d 357, 362 (5th Cir.1993)(relying on SSR 83-20).

value of a vocational expert witness, who is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir.1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir.1986).

Here, Ms. Gilreath, the vocational expert, was asked whether a hypothetical person with Plaintiff's limitations could "do any of the claimant's past work?" She testified that Barraza could not return to work in his prior position as a security guard at the Holiday Inn, because it required too much walking. She explained, however, that Barraza could still work as a security guard, as that position is generally performed in the economy. In light of this testimony, there is substantial evidence to support the ALJ's decision that Plaintiff was capable of returning to his prior relevant work as a security guard, albeit, probably not at the Holiday Inn.

In this case, the ALJ reached a decision on Plaintiff's residual functional capacity that is consistent with the record and supported by substantial evidence. The ALJ presented a hypothetical question that incorporated all of the limitations described in the residual functional capacity finding. The vocational expert witness testified that, with these limitations, Plaintiff could fulfill the job duties of a security guard, as that job is generally performed in the economy, even though he could not return to his previous job at the Holiday Inn. On this record, there is substantial evidence to support the ALJ's decision.

### *Conclusion*

Here, it is clear that the ALJ considered both the subjective and objective evidence in assessing Plaintiff's testimony about his complaints, the severity of his impairments, and deciding his residual functional capacity. *See Wingo*, 852 F.2d at 830. The ALJ described the medical evidence and opinions supporting each step of his evaluation of Plaintiff's claim. There

is substantial evidence to support the ALJ's decision at each step of the analysis. As a result, his decision need not be disturbed. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452. For these reasons, Defendant's motion for summary judgment is granted, and Plaintiff's motion is denied.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED**, and that Plaintiff's motion for summary judgment is **DENIED**.

**SIGNED** at Houston, Texas, this 18th day of September, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**